**William L. KUKLA and Denise A. DeVore Kukla, Plaintiffs,**

v.

**VILLAGE OF ANTIOCH, a municipality, Charles H. Miller, individually and in his official capacity as Chief of Police, Mary Lou Weber, Robert C. Wilton, Donald Amundsen, Ronald Cunningham, and Rod White, each of them individually and in their official capacities as members of the Antioch Village Board of Trustees; and Kenneth M. Clark, in his official capacity as Village Attorney, Defendants.**

**No. 85 C 7946.**

United States District Court, N.D. Illinois, E.D.

Nov. 6, 1986.

Thomas W. Duda, Thomas M. Cannon, Cooper & Cooper, Ltd., Buffalo Grove, Ill., for plaintiffs.

Gregory G. Lawton, Judge & Knight, Ltd., Park Ridge, Ill., for defendants.

MORAN, District Judge.

## MEMORANDUM AND ORDER

A male sergeant and a female dispatcher of a village police department were fired for living together. They bring an action alleging that both the fact of and the procedures accompanying their firing infringed their rights to privacy, freedom of association and due process under the United States Constitution. The village and its agents move to dismiss or in the alternative for summary judgment. Because of the particular facts presented here in what is a highly fact-dependent area, the motion for summary judgment is granted in substantial part. Decision on the due process claim is withheld pending further development of the record and briefing from the parties.

## FACTS

The police force of the Village of Antioch, Illinois, consists of twelve officers. It is headed by the police chief, followed by a lieutenant, and then two sergeants. All other officers are patrolmen. The depart-

ment also employs four dispatchers. Plaintiff William Kukla was one of the two sergeants with the department. Plaintiff Denise Kukla was a dispatcher. During the period during which they both worked for the department, they were not husband and wife. The Antioch Board of Trustees terminated them on April 11, 1985, for failure to comply with Police Department Directive No. 72, which reads as follows:

Based upon considerations of public policy and the necessity for military-type discipline and respect, it will be misconduct justifying discharge for employees of different ranks to socialize in situations inimical to the discipline and order of the Department.

Antioch Police Chief Charles Miller promulgated that regulation on August 16, 1984. Its history has some relevance to the instant case. According to Chief Miller's affidavit, in the first half of 1984 Sgt. Kukla was dating a dispatcher named Christine Dick. She made a number of serious errors as a dispatcher, among them sending vehicles to far distant locations when other vehicles were closer. However, no patrol officers had reported those errors to Miller, apparently to avoid offending Sgt. Kukla. Eventually Miller learned of them, and Ms. Dick resigned in July 1984. Chief Miller then issued the directive, intending to prevent a recurrence. Plaintiff Denise Kukla, then Denise DeVore, was hired to replace Ms. Dick. Both William and Denise Kukla were on notice of the directive.

Plaintiffs began dating in October 1984. Their relationship started becoming serious in November. At some point between that time and February 1985 they began living together at Denise's home. The dispute as to the timing depends on one's definition of "living together"; plaintiffs do not dispute that William spent considerable time at Denise's home beginning in November, or that they had a sexual relationship. Chief Miller learned of their relationship in mid-January 1985 and conferred with both of them on February 11. Denise worked her next shift after that meeting but did not report for work thereafter. She explains her actions as an attempt to save William from an adverse employment decision. Chief Miller nevertheless reported both of them to the Village Attorney and Village Board.

The Board authorized the attorney to prefer charges leading to their dismissal. While those charges were pending, but before any hearing was held, William and Denise were married in Las Vegas, Nevada. William reported himself sick in order to travel to Las Vegas for the wedding. On April 11, 1985, the Board heard the charges, took testimony, and after deliberation ordered both William and Denise dismissed from their employment.

Plaintiffs bring this action under 42 U.S.C. § 1983 against the Village, Chief Miller, the members of the Village Board, and Kenneth Clark, the Village Attorney. They claim that directive no. 72 and their firing under it infringed their constitutional rights of freedom of association and privacy. They also assert that the regulation was arbitrarily and capriciously applied to them, depriving them of equal protection of the laws. They further complain that they were terminated without due process of law in that the Board did not decide to terminate them impartially on the basis of the evidence presented at their hearing, but rather on the basis of prior *ex parte* communications from defendant Clark. William Kukla, alone, also brings a claim against the Village for back overtime pay under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*

The defendants now move for dismissal or in the alternative for summary judgment on various grounds. All defendants, including the Village, contend that (1) directive no. 72 does not infringe plaintiffs' constitutional rights since the Village, as an employer, may restrict the conduct of its employees when the restriction is narrowly drawn in support of a legitimate employment-related interest; (2) plaintiffs have no equal protection claim since they have not alleged that the regulation was intentionally used to discriminate against them on the basis of their membership in a group or

class; (3) no due process rights were implicated by the discharge, since the Kuklas had no property interest in their jobs, and the charges affected no liberty interest since the charges did not defame the Kuklas; (4) William Kukla has no FLSA claim since the decision allowing application of that act to units of local government, *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), should not apply retroactively. The members of the Village Board assert that as legislators they have absolute immunity to any damage award under § 1983. Clark asserts absolute prosecutorial immunity, and Chief Miller a qualified immunity under the rule of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Both sides have submitted affidavits and documents, and defendants also submit a transcript of the Board's hearing and its official decision.

## DISCUSSION

### I. Discharges of Public Employees as a Burden to the Exercise of their Constitutional Rights

The Kuklas claim that under the principles of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a police department regulation which allows their discharge for living together is unconstitutional. *Perry* held that an opportunity for employment with a government must be treated like any other government benefit for purposes of constitutional law. The state "may not deny [that] benefit to a person on a basis that infringes his constitutionally protected interests." 408 U.S. at 597, 92 S.Ct. at 2697. An employee at will who would have no legal recourse if fired by a private employer nevertheless may have an action if his or her employer is a government agency and he or she was fired for a constitutionally impermissible reason.

### A. Varying Results for Association and Privacy Claims

The Kuklas contend that *Swope v. Bratton,* 541 F.Supp. 99 (W.D.Ark.1982), is on all fours with the instant case and should dictate this court's result. In *Swope,* as here, a police sergeant was accused of cohabitation with a dispatcher. The court held that the department could not demote him to patrolman for that reason. Plaintiffs also rely on such cases as *Littlejohn v. Rose,* 768 F.2d 765 (6th Cir.1985), *cert. denied,* 475 U.S. ——, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986), which held that a public school system could not refuse to rehire a non-tenured teacher merely because she was going through a divorce, and *Briggs v. North Muskegon Police Dept.,* 563 F.Supp. 585 (W.D.Mich.1983), *aff'd mem.,* 746 F.2d 1475 (6th Cir.1984), *cert. denied,* 473 U.S. ——, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985), which found that the discharge of a police officer for an adulterous cohabitation was unconstitutional. The Kuklas maintain that their relationship had constitutional protection through their freedom of association and right to privacy. Firing them for it without any evidence that it diminished their on-the-job performance, they argue, infringed their constitutionally protected interests.

The cases dealing with unfavorable personnel actions against employees in law enforcement for their private and personal associations, however, do not line up neatly behind plaintiffs' (or defendants') stance. *Wilson v. Taylor,* 733 F.2d 1539 (11th Cir. 1984), and *Shuman v. City of Philadelphia,* 470 F.Supp. 449 (E.D.Pa.1979), like *Swope* and *Briggs* held unconstitutional unfavorable employment decisions grounded on officers' friendships with the opposite sex. In *Wilson,* a policeman discharged for dating the daughter of an organized crime figure brought a constitutional claim against his department, and won. *Shuman* concerned a veteran officer who left his wife for cohabitation with an 18-year old. The court voided his firing. But, on the other hand, in *Potter v. Murray City,* 760 F.2d 1065 (10th Cir.), *cert. denied,* 474 U.S. ——, 106 S.Ct. 145, 88 L.Ed.2d 120

(1985), a Utah municipality could constitutionally discharge a policeman on discovering that he practiced polygamy, even though he asserted not only his right to privacy but his admittedly sincere religious beliefs. And the court in *Suddarth v. Slane,* 539 F.Supp. 612 (W.D.Va.1982), saw no constitutional difficulty when state police terminated a state trooper for an adulterous affair.

Even the cases involving relationships within the same department do not yield one-sided results. In *Thorne v. City of El Segundo,* 726 F.2d 459 (9th Cir.1983), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984), a police department clerk-typist was dropped from the list of eligible applicants for officer, despite strong examination scores, because she had once had an affair with a married policeman. The department's action infringed her right to privacy. But in *Shawgo v. Spradlin,* 701 F.2d 470 (5th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983), when cohabitation of a police sergeant and a patrolwoman was punished by demoting him and suspending her, the department did not infringe their constitutional rights.

### B. A Fact-Dependent Balance

As this discussion shows, when a public employer attempts to restrict the associations or sexual life of an employee and the employee sues, results vary. *See Briggs,* 473 U.S. at ——, 105 S.Ct. at 3536 (White, J., dissenting from denial of certiorari). The different results do not, however, necessarily indicate different attitudes toward employee rights by different courts. When a police officer skirted department procedures to set up a "personal" investigation of a woman's complaint that turned into a liaison with her, the same judge that had decided *Briggs* found no constitutional infringement in the discharge of that officer. *Jackson v. Howell,* 577 F.Supp. 47 (W.D. Mich.1983). Rather, the mixed results stem from the fact-dependent nature of the analysis necessary when a public employee claims that the reason for his discharge

was his exercise of his constitutional rights.

The principle of *Perry* and *Mt. Healthy* developed from cases such as *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *See Perry,* 408 U.S. at 597, 92 S.Ct. at 2697 (*citing Sherbert* and related cases). In *Sherbert,* the Supreme Court held that a state's interest in preventing spurious unemployment compensation claims did not outweigh the burden to a Seventh Day Adventist's free exercise of religion when the state denied her benefits because she would not work on Saturdays. Such cases have always involved balancing the weight of the government interest at stake in the particular fact situation against the strength of constitutional protection for the right asserted and the degree to which the government's denial of benefits burdens its exercise. *See Bowen v. Roy,* 476 U.S. ——, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (government's interest in efficiency of internal procedures outweighs burden to religion of native Americans through assignment of social security number); *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (interest in eradicating racial discrimination outweighs burden of denial of charitable status for tax deduction purposes to college with religious belief in segregation); *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 718–719, 101 S.Ct. 1425, 1432–1433, 67 L.Ed.2d 624 (1981) (reaffirming *Sherbert* ); *Sherbert,* 374 U.S. at 406–408, 83 S.Ct. at 1796. The results of such balancing tests are inevitably highly dependen on the particular facts and circumstances of the case, and the decisions where the benefit is public employment are no exception. *See Connick v. Myers,* 461 U.S. 138, 150, 103 S.Ct. 1684, 1691–1692, 75 L.Ed.2d 708 (1983); *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986).

The framework for striking the appropriate balance in a public employment case is provided by two Supreme Court decisions: *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Kelley v. Johnson,* 425 U.S. 238, 96

S.Ct. 1440, 47 L.Ed.2d 708 (1976). In *Pickering,* the Court found unconstitutional a school board's dismissal of a teacher for publishing a letter criticizing the amount of money spent on athletics in that school system. *Perry* and *Mt. Healthy* are progeny of *Pickering. See Connick,* 461 U.S. at 143 n. 4, 103 S.Ct. at 1688 n. 4. *Pickering* also remains a basic reference point not only for cases involving freedom of speech but for all claims that a government, as employer, has taken a personnel action which unconstitutionally infringes a protected interest. *See, e.g., Wilson v. City of Littleton,* 732 F.2d 765, 767 (10th Cir.1984). *Kelley* upheld the validity of a hair length regulation for county policemen. Its analysis is particularly helpful when an employee challenges restrictions on "freedom of choice in personal matters." 425 U.S. at 246, 96 S.Ct. at 1445; *see, e.g., Shawgo,* 701 F.2d at 483. In the Seventh Circuit we also benefit from the extensive analysis of *Egger v. Phillips,* 710 F.2d 292 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), in which the Court, sitting *en banc,* found no constitutional infringement when the Federal Bureau of Investigation transferred an agent after he had publicly accused another agent of giving false or misleading testimony.

None of these cases provide us with a bright-line standard for decisions, because the potentially infinite number of combinations of an employing agency, a job, and an employee's conduct make such a standard impossible. *Pickering,* 391 U.S. at 569, 88 S.Ct. at 1735; *Egger,* 710 F.2d at 315. However, a government usually may limit an employee's conduct to a greater extent than it could if the actor were a private citizen. *Kelley,* 425 U.S. at 249, 96 S.Ct. at 1446–1447; *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–1735. The government, as employer, has a legitimate interest in providing government services effectively. Thus when the benefit at stake is a government job, and the individual's exercise of a right interferes with the provision of government services, the government interest carries more weight in the balance against the exercise of the right. *See also*

*Connick,* 461 U.S. at 150, 103 S.Ct. at 1691–1692; *Mt. Healthy,* 429 U.S. at 284, 97 S.Ct. at 574–575; *Egger,* 710 F.2d at 319. For example, to deny a benefit to a citizen who is asserting that the denial significantly burdens a fully protected fundamental right, a government must ordinarily show that the denial is necessary to achieve a compelling state interest. *See Thomas,* 450 U.S. at 718, 101 S.Ct. at 1432; *Sherbert,* 374 U.S. at 403, 83 S.Ct. at 1793–1794. To justify firing an employee asserting a similarly protected right, the government need only establish a significant relationship to its needs as employer. *See Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 414–415, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979); *Pickering,* 391 U.S. at 573, 88 S.Ct. at 1737.

The Constitution will not, however, permit a public employer to punish conduct merely because it does not approve of it. The employer must be legitimately responding to the effects of the conduct on the functioning of the agency. *Connick,* 461 U.S. at 154, 103 S.Ct. at 1693–1694; *Egger,* 710 F.2d at 320. If the restriction has no relation to the provision of government services, the government's extra interest as employer is not implicated. It then has no more power to limit the employee's conduct than it would if the employee were any other citizen. *See Pickering,* 391 U.S. at 574, 88 S.Ct. at 1737–1738. The public employer-employee cases thus turn on the extent to which the restriction of the employee's rights relates to the demands of the government agency's work.

The scales ultimately tip on whether the restriction is sufficiently related to the agency's work to outweigh the protection given to the right. As the degree of protection the Constitution gives to the employee's conduct decreases, so does the burden on the government to justify its restriction on the conduct. *Kelley,* 425 U.S. at 245, 96 S.Ct. at 1444–1445. For example, when the conduct the employer seeks to restrict is fully protected speech, typically the Court has looked for a showing that the employee conduct has had a

significant negative impact on the employee's job performance, *Pickering*, 391 U.S. at 572, 88 S.Ct. at 1736–1737, on the regular, efficient operation of the government agency, *id.* at 573, 88 S.Ct. at 1737, or on the public's perception of that agency, *id.* at 572, 88 S.Ct. at 1736–1737. *Cf. Connick*, 461 U.S. at 150–151, 103 S.Ct. at 1691–1692; *Givhan*, 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4; *Egger*, 710 F.2d at 319. But in *Connick*, which upheld the discharge of an employee who had circulated an office questionnaire about her grievances, the Supreme Court applied an intermediate level of scrutiny. The questionnaire, though protected speech, did not implicate matters at the core of First Amendment values. 461 U.S. at 145, 152, 103 S.Ct. at 1689, 1692–1693. The Court was satisfied when it found merely a reasonable belief that the conduct would have a significant negative impact on the operations of the agency. *Id.* at 154, 103 S.Ct. at 1693–1694; *see also Egger*, 710 F.2d at 322 (scope of protection for agent's statements). And, as *Kelley* held, when conduct enjoys only minimal protection, as the choice of hairstyle or hair length does, restriction of it is justified merely by a rational connection between the restriction and the work of the agency. 425 U.S. at 247, 96 S.Ct. at 1445–1446.

The *Pickering-Kelley* balance thus is a process of weighing the amount of constitutional protection given to the conduct in question against the extent to which restriction of it is necessary for the government agency to function. To analyze the Kuklas' claim this court must first determine how much protection the Constitution gives to their conduct. *Cf. Kelley*, 425 U.S. at 245, 96 S.Ct. at 1444–1445; *Egger*, 710 F.2d at 322. Then we must weigh the extent of the police department's need, as their employer, to restrict it against that degree of protection. *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–1735.

## II. Constitutional Protection for Relationships

The Supreme Court in *Kelley* did not just hold that the weight of the employee's interest varies with the right asserted. It also specifically distinguished between the exercise of fundamental rights such as free speech, which "explicit language of the First Amendment" protects, and conduct which "implicates only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment." 425 U.S. at 245, 96 S.Ct. at 1444–1445. To the extent that the employee's conduct merely expresses "freedom of choice in personal matters," *id.* at 246, 96 S.Ct. at 1445, as did the length of hair in that case, it enjoys less protection. *See also Division 241 Amalgamated Transit Union v. Suscy*, 538 F.2d 1264, 1266 (7th Cir.), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976). The distinction parallels the analysis employed in public employee speech cases, where speech "on a matter of public concern" has maximum constitutional protection from employer discipline, but comment on "private matters ... only of personal interest" has little or none. *Connick*, 461 U.S. at 146–147, 103 S.Ct. at 1689–1690.

The Kuklas here assert a right to live together which they believe is protected by their freedom of association, and a right to engage in private consensual sexual activity which they believe is protected by their right to privacy. Neither of these interests receives the same degree of protection as speech on public matters. For example, their complaint attempts to invoke the First Amendment under the guise of their freedom-of-association claim. However, freedom of association in the sense of "choices to enter into and maintain certain intimate human relationships" falls not under the First Amendment but rather under the interest in personal liberty protected by the due process clause. *Roberts v. United States Jaycees*, 468 U.S. 609, 617–618, 104 S.Ct. 3244, 3249–3250, 82 L.Ed.2d 462 (1984). Thus, under *Kelley*, it has less than maximum protection.

Further, the degree of constitutional protection for an "intimate" association depends on exactly what relationship is in-

volved. Only traditional relationships with a cognizable basis in law—those associated with marriage and family—receive maximum protection within this category. *Roberts,* 468 U.S. at 619–620, 104 S.Ct. at 3250–3251. For example, in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Supreme Court upheld against constitutional challenge a zoning ordinance which restricted the number of unrelated persons who could live together in the same dwelling. In the process, the majority declined Justice Marshall's invitation to extend full constitutional protection to a "personal lifestyle choice" about whom to live with. *Id.* at 16, 94 S.Ct. at 1544–1545 (Marshall, J., dissenting).

■ The Kuklas' decision to live together thus does not carry the same weight in the constitutional balance as the teacher's decision to seek a divorce in *Littlejohn.* As that court pointed out, access to divorce enjoys a considerable measure of constitutional protection because otherwise the state could unduly burden the fundamental right to marry or, more specifically, the right to remarry. 768 F.2d at 768, *citing Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971); *cf. Zablocki v. Redhail,* 434 U.S. 374, 383–384, 98 S.Ct. 673, 679–680, 54 L.Ed.2d 618 (1978) (state law linking ability to remarry to child support payment unconstitutional). For purposes of constitutional law, the choice to live together without benefit of marriage is not a fundamental right, but rather part of the "more general contours of the substantive liberty interest" *Kelley* speaks of. The state cannot restrict it without a reason, but the reason need not be compelling.

■ The Kuklas' relationship fares no better under a "right to privacy" rubric. As with associations, the degree of protection for consensual sexual conduct depends on what conduct is involved. The Supreme Court has never expressly held that sexual decisions rank among the fundamental rights. When it struck down certain restrictions on the sale of contraceptives, for example, the decision was not based on the impact of those restrictions on sexual choice, but rather on the decision "whether to bear or beget a child." *Carey v. Population Services International,* 431 U.S. 678, 686, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977). Indeed, a majority of the Court expressly denied that the case was about private consensual sexual behavior. *Id.* at 688 n. 5; 694 n. 17, 97 S.Ct. at 2018 n. 5; 2021 n. 17 (plurality); 702, 97 S.Ct. 2025 (White, J., concurring); 713, 97 S.Ct. 2030–2031 (Stevens, J., concurring). Recently the Court made clear that not all forms of "private sexual conduct between consenting adults" are "constitutionally insulated from state prescription." *Bowers v. Hardwick,* 478 U.S. ——, ——, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (homosexuals have no fundamental right to engage in sodomy). *See also Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 68 n. 15, 93 S.Ct. 2628, 2641 n. 15, 37 L.Ed.2d 446 (1973) (states may prohibit bigamy); *George v. Texas,* 788 F.2d 1099 (5th Cir.1986) (single male unable to have prohibition of prostitution declared unconstitutional as infringement of his "right to sex"). While we would not presume from these decisions that the Kuklas' sexual choices outside of marriage have no protection, they do not have maximum protection.

Plaintiffs' claims thus come closer to a claim of infringement of a general liberty interest than to a claim based on a fundamental First Amendment right like speech. *Cf. Kelley,* 425 U.S. at 245, 96 S.Ct. at 1444–1445. As a privacy claim, plaintiffs make a "challenge to the state's ability to restrict [their] freedom of action in a sphere contended to be private," *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976), which is a claim akin to one grounded in liberty. As a claim for freedom to associate with each other, it falls under Fourteenth Amendment liberties, not First Amendment associations. *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3250. Thus, in the words of *Kelley,* 425 U.S. at 245, 96 S.Ct. at 1445, "there is surely even more room for restrictive regu-

lations" by the police department on their conduct than for restrictions on their freedom of speech.

█ At the same time, we think these private choices carry more weight in a constitutional balance than selection of hair length. They fall within the "personal intimacies of the home," *Slaton*, 413 U.S. at 65, 93 S.Ct. at 2639, or one's "right to satisfy his ... emotional needs in the privacy of his own home," *Stanley v. Georgia*, 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969), which have significant constitutional protection against unwarranted state intrusion. *See, e.g., Thorne*, 726 F.2d at 469; *Shuman*, 470 F.Supp. at 459. We conclude, with *Briggs*, that cohabitation and sexual choice fall in the category of rights given intermediate scrutiny in public employee discharge cases, so that we expect justification of the restrictions "on more than a minimal rationality basis." 563 F.Supp. at 590. Thus we borrow our standard for the *Pickering-Kelley* balance from *Connick*, 461 U.S. at 154, 103 S.Ct. at 1693–1694. The departmental regulation should be supported by a reasonable belief that the conduct would have a significant negative impact on the Kuklas' job performance, the operations of the police department, or the public's perception of the department.

Under that standard, the factual questions on which the Kuklas base their opposition to defendants' motion turn out not to be material. The Kuklas contend that they could not be discharged unless either their job performance or the police department's effectiveness suffered because of their relationship, and that defendants cannot demonstrate an absence of dispute on those factual issues. But in an intermediate scrutiny case, the government employer need not wait until the employee's conduct actually injures the agency to take action. *Connick*, 461 U.S. at 152, 154, 103 S.Ct. at 1692–1693, 1693–1694. The question is rather whether the facts support a reasonable belief that the conduct, if it continues, will injure the agency. *Id.* at 154, 103 S.Ct. at 1693–1694. Defendants do not base

their motion for summary judgment on a contention of actual injury to the department. Indeed, they admit that the Kuklas did their jobs well enough, and do not point to any specific effect of their relationship on the department's operations. Rather, defendants contend that the department could regulate a relationship across ranks, and discharge the Kuklas for ignoring the regulation, without infringing the Constitution. The contention is a sound basis for summary judgment if the facts support a reasonable belief that a relationship across ranks would have a significant negative impact on the department.

Undisputed on this record are the facts that both Kuklas were employees of a police department, that the department is small, that William Kukla was a sergeant and Denise a dispatcher, that they had an intimate relationship, that a few months earlier a relationship had developed between William and a previous dispatcher, that because of this relationship criticism of that dispatcher's performance had been muted, that Chief Miller issued directive no. 72 in response to that situation, and that William and Denise disobeyed directive no. 72. We now turn to the weight of those facts on the scales established by *Pickering* and *Kelley*.

## III. The Pickering-Kelley Balance Applied

For our determination of whether the department's belief in negative effects was reasonable, case law instructs us to consider all relevant aspects of the employment. For example, we need to look at the nature of the work performed by the employing agency, the employee's place in that work, the need of the agency for harmony and cooperation among its employees, and the importance of morale to the agency. *Kelley*, 425 U.S. at 247, 96 S.Ct. at 1445–1446; *Pickering*, 391 U.S. at 570–571, 88 S.Ct. at 1735–1736; *Egger*, 710 F.2d at 312 n. 23, 319. Then we consider the conduct in light of those factors, plus any past events within the agency which may have borne on the agency's decision. *Egger*, 710 F.2d at 320–

321; *Swope*, 541 F.Supp. at 107. That analysis here leads inexorably to the conclusion that the Kuklas' case differs significantly from the cases where the employment decision infringed constitutional rights.

The Kuklas worked for the police department, and the police power represents a very strong government interest. *See, e.g., Vorbeck v. Schnicker*, 660 F.2d 1260, 1263 (8th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982); *Byrd v. Gain*, 558 F.2d 553, 554 (9th Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Regulations for police personnel enjoy a presumption of validity because they stem from the police power. *Kelley*, 425 U.S. at 246–247, 96 S.Ct. at 1445–1446.

Given a police department's need for a high degree of discipline and morale, it may impose some kinds of restrictions on the personal freedoms of its employees where other government agencies could not. For example, a ban on beards for road repair crew workers could not be justified on the road crew's need for *esprit de corps. Nalley v. Douglas County*, 498 F.Supp. 1228 (N.D.Ga.1980). But *Kelley*, 425 U.S. at 248, 96 S.Ct. at 1446, upheld a hair length regulation for policemen largely on that ground. Thus *Littlejohn* is distinguishable from the instant case for a second reason. The government has more justification for regulating the private life of a policeman than that of a teacher.

Some circuits have gone so far as to consider a police force a paramilitary organization with the military's need for discipline and uniformity. *See Shawgo*, 701 F.2d at 483; *Vorbeck*, 660 F.2d at 1263. If that were true in this circuit, then our inquiry could have stopped long ago. The department could probably restrict even fundamental rights for no better reason than a clash of the exercise of the right with its dress code, *see Goldman v. Weinberger*, 475 U.S. ——, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (orthodox Jew's religious need to wear a yarmulke outweighed by Air Force regulation against head gear

indoors), let alone less protected rights such as sexual choices. *Cf. Rich v. Secretary of the Army*, 735 F.2d 1220, 1228–1229 (10th Cir.1984); *Beller v. Middendorf*, 632 F.2d 788, 810–811 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981) (both upholding restrictions on homosexuals in military forces). However, the Seventh Circuit expressly does not "analogize state and local law enforcement agencies to military forces for purposes of analyzing the police officers' liberties." *Egger*, 710 F.2d at 312.

Nevertheless, this circuit recognizes that the nature of police work means that the Constitution probably allows greater restrictions on police officers' activities than on those of any other type of public employee. *Id.* at 312 n. 23; *Benson*, 786 F.2d at 278. To some extent, individual differences between officers must be submerged to the needs of the group, because at any time officers may be called upon to work together in an intensely cooperative way. *Egger*, 710 F.2d at 319. The question here, then, is whether the Antioch Police Department and Chief Miller could have reasonably believed that, given the special needs of police work, the off-duty relationship of the Kuklas could have an on-duty impact.

There is little question that the department could reasonably believe that some kinds of associations and relationships could have impact on the police force's effectiveness. The officer's abuse of his position in *Jackson* did not cease to be grounds for dismissal because the goal of his abuse was a sexual encounter. 577 F.Supp. at 51. In *Jackson*, departmental integrity was fairly at stake. In *Baron v. Meloni*, 602 F.Supp. 614 (W.D.N.Y.1985), a sheriff could constitutionally order one of his deputies to stop seeing the estranged wife of a reputed crime figure who was then under investigation, and fire him when he ignored the order. Police work could have been undermined by the association. *Wilson v. Taylor* is not to the contrary, despite its decision for the policeman who dated the mobster's daughter. The department there had chosen to argue only

that an officer's dating relationship had no constitutional protection, not that restrictions on it could be justified by the nature of police work. 733 F.2d at 1544–1545 n. 3. Defendants here have not made the same mistake.

Defendants did not attempt to regulate all the relationships of their employees, but rather only their relationships with other department employees of different rank. The narrow focus of the regulation sets it apart from two more of the cases on which the Kuklas rely. In neither *Briggs* nor *Shuman* was the object of the officer's affections another employee of the department. Impact on the force obviously is more likely when both halves of the relationship are members of it. *See Shawgo*, 701 F.2d at 483.

The Kuklas' situation may be further distinguished on the size of their town, or more specifically for the matter at hand, the size of their police force. *Cf. Suddarth*, 539 F.Supp. at 615; *Shuman*, 470 F.Supp. at 459. We take judicial notice of the population of Antioch in the 1980 census, 4,419. The entire department consisted of 16 employees, including the dispatchers. Members of this force unavoidably had to work closely together. The instant case thus is not on all fours with *Swope*, as plaintiffs contend. The reported decision of that case does not tell us the size of the department there, but we note that Camden, Arkansas, where the events took place, had a population of 15,356 in 1980, more than three times the size of Antioch. *Egger* notes that certain reactions by members of a work force are predictable because of ordinary human nature and makes the application of common sense, taking those reactions into account, part of its analysis. 710 F.2d at 322–323. If an Antioch sergeant developed a relationship with an Antioch patrolman or dispatcher, certain reactions are predictable, among them that other Antioch patrolmen and dispatchers would tiptoe lightly around certain subjects for fear of offending that sergeant. After all, in Antioch, offending one sergeant meant offending half of all the sergeants on the force. Given human nature, a belief

that an intra-departmental relationship would negatively affect the department is more reasonable on a small force than a large one.

■ The size of the Antioch department alone probably justifies the regulation. But in the instant case, experience also supported a belief in the likelihood of negative effects from such a relationship. The *Swope* court found no evidence of any effect on police operations in Camden from the relationship of the officers there, and no grounds for anticipating any. 541 F.Supp. at 109. Such was not the case in Antioch. Directive no. 72 was issued in response to the effect of Sgt. Kukla's relationship with a previous Antioch dispatcher. She did not perform well, but the patrolmen who worked with her did not report that fact to Chief Miller for fear of offending Sgt. Kukla. Nor can we say that Miller's desire for an accurate picture of her performance was unrelated to the operation of the agency. A police force's effectiveness may sometimes depend upon the speed of its response, yet Ms. Dick did not always dispatch to a location the units in a position to make the fastest response. On these facts, the department had more than enough reasons to believe that it needed to regulate relationships across ranks.

■ Since the regulation was reasonable, so was discharging the Kuklas for violating it. Another fact on which results in public employee cases can turn is whether or not the personnel action followed existing policy. A major purpose of the *Pickering-Kelley* fact-based analysis is to help the court determine whether the employer is legitimately responding to negative effects on the agency or merely punishing conduct it doesn't like. *Egger*, 710 F.2d at 320. A response based on a preexisting policy is more likely to be a legitimate response. *Thorne*, the only one of plaintiffs' cases which we have not already distinguished, turned in large part on the absence of a policy. The *Thorne* court expressly commented on the lack of any regulation on which dropping the applicant

from the list of those eligible to become an officer could be based, and noted that the department took no action against her partner in the affair. 726 F.2d at 470. The *Swope* court went even farther, finding "a bad relationship" between the demoted officer and his chief, dating back to the officer's support of another candidate for chief, which influenced the departmental reaction to the situation between the officer and the dispatcher. 541 F.Supp. at 107. A lack of evidence that the officer and the dispatcher were actually cohabiting supported the inference that the chief regarded the situation as a good chance to rid himself of the sergeant. The dispatcher and her children had moved into the officer's house during a period of criminal activity in her neighborhood, while he took over her residence. The facts could just as well be explained by the sergeant's concern for the safety of the dispatcher and her children as by a desire to cohabitate. *Id.* at 104–105, 109. Here, in contrast, the discharge came pursuant to a regulation. There is no evidence that Chief Miller was out to get Sgt. Kukla. Indeed, Sgt. Kukla was not fired because of his first relationship with a dispatcher, but only after his second, and after a regulation had been promulgated against such conduct.

The *Pickering-Kelley* balance thus tips differently for the Kuklas than in any of the cases on which they rely. The factual disputes which, they contend, prevent summary judgment center on their own performance of their jobs and the effect of their relationship on departmental operations. But there is no dispute about other facts which, in light of existing case law, make a belief that their conduct was likely to injure departmental operations a reasonable belief. The department issued a regulation to prevent a recurrence of a situation which had hurt the department. The Kuklas' relationship presented virtually the identical situation. The Kuklas could constitutionally be discharged for disobeying the regulation regardless of whether their relationship was currently affecting the department.

The Kuklas have one last argument. They are now married. They contend that the regulation also burdens their fundamental right to marry since, as worded, it prohibits a marriage as well as cohabitation across departmental ranks. The argument has echoes of overbreadth, since plaintiffs were not married when they first ran afoul of the regulation. But even taking their interpretation as appropriate, the constitutional balance still would favor the regulation. Constitutional protection for the right to marry has not voided reasonably drawn antinepotism rules. *See Cutts v. Fowler,* 692 F.2d 138 (D.C.Cir.1982) (upholding 5 U.S.C. §§ 2302(b)(7) and 3110 against identical argument). Here, if the right to marry has more weight because of the greater degree of protection for it, nevertheless so does the government's interest. A concern that criticism of an employee's performance will be chilled because the employee is the sergeant's friend, applies with even greater force where the employee is the sergeant's wife.

We emphasize that our decision rests on the balance produced by these facts. The police department of, for example, Chicago would have a much more difficult task under the *Pickering-Kelley* balance in justifying the discharge of a sergeant and a dispatcher for their off-duty living arrangements. The Chicago police force is not small. A sergeant who is one of many is far less likely to be able to exert the kind of pressure that would prevent fair evaluation of the dispatcher's performance. And even if the situation did create problems, transfer would be available as a less drastic remedy. *Cf. Cutts,* 692 F.2d at 139. Police officers are not without rights. Their rights are, however, limited by the need of a government to provide police protection to its citizens.

It may be that Antioch is rather more interested in the private lives of its police officers than it needs to be. The question before us, however, is not whether we think directive no. 72 is good policy, but rather whether firing the Kuklas under it infringed their constitutional rights. The

intermediate protection given to the rights they assert is more than balanced by the facts on the department's side of the scales: a small police force, prior problems with a relationship across ranks, a regulation drawn to those problems, and a relationship across identical ranks which moreover involved one of the same parties. Given those facts, we cannot find either the regulation or the discharge unconstitutional. Defendants are entitled to summary judgment on the association and privacy claims.

## IV. Other Constitutional Questions

### A. Equal Protection

The Kuklas also press an equal protection claim. They assert that others violated directive nc. 72, for example through hunting trips or bowling matches which included men of different ranks, but were not discharged. The "arbitrary and capricious enforcement," they say, deprived them of equal protection of the laws.

■ This argument need not detain us long. Absent an allegation of class-based discrimination—*i.e.*, discrimination on the basis of race or sex or religion or national origin—in the enforcement of a regulation, or an allegation that the regulation has no rational basis, the mere failure of those who administer a regulation to treat all violations of it precisely equally does not implicate equal protection. *See, e.g., United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755 (1979); *Harrington v. United States*, 673 F.2d 7, 9 (1st Cir.1982). The strong government interest in the effectiveness of its police force means that those who make personnel decisions for the police have, if anything, wider discretion than most in enforcing regulations. *Herzbrun v. Milwaukee County*, 504 F.2d 1189, 1196 (7th Cir.1974). Distinguishing between cohabitation and bowling falls well within the range of that discretion. The Kuklas have no equal protection claim.

### B. Due Process

Plaintiffs also assert that *ex parte* communications between their adversary, Village Attorney Clark, and the members of the Board tainted their hearing, depriving them of the fair procedure to which they were entitled under the due process clause. That clause, however, protects only against deprivations of life, liberty or property. The threshold inquiry in any procedural due process claim thus must be whether the state's alleged deprivation touched any interests of a kind protected by the clause. *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977).

■ When the claim rests on loss of a public job, two interests are possible: a liberty interest in the opportunity to pursue one's chosen occupation, and a property interest in one's job. *See generally D'Acquisto v. Washington*, 640 F.Supp. 594, 607–611 (N.D.Ill.1986). If the charges made when an employee was fired were so defamatory as to seriously impair employability, the employee has a right, grounded on his liberty interest, to a fair hearing to clear his name. 640 F.Supp. at 608. The Kuklas, however, have no liberty interest claim. To be defamatory the charges must be false. *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977). We do not understand the Kuklas to dispute that they were of different ranks, or that they socialized with each other.

The more substantial question here is whether either William or Denise, or both, had protected property interests. If the Kuklas could not be fired except for cause, they would have property interests in their jobs. If so, then they would have rights to fair hearings on the charges before being deprived of them. *See, e.g., D'Acquisto*, 640 F.Supp. at 607. A governmental unit as employer may create a property interest in an employee or a group of employees by statute, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); by a contract term making the employee dischargeable only for cause during a particular period, *Perry v. Sindermann*, 408 U.S.

593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); or by conduct of its agents which creates a mutual understanding or otherwise enforceable obligation between the parties. *Id.* at 601–602, 92 S.Ct. at 2699–2700; *Vail v. Board of Education of Paris Union School District no. 95,* 706 F.2d 1435, 1438 (7th Cir.1983).

Plaintiffs here speak of a violation of due process, but do not allege that they each had a property interest in their respective jobs. Defendants assert that both were employees at will. Under ordinary circumstances, plaintiffs' conclusory allegations could not survive a motion to dismiss, let alone one for summary judgment. *See Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985). But summary judgment requires that we draw all reasonable inferences which would favor the party opposing the motion from the facts on the record before us. *See Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985). In the instant case, because of Illinois law, Antioch's use of a hearing in charging the Kuklas, and evidence of two classes of employees which defendants themselves have submitted, a trier of fact could reasonably infer a property interest.

To determine if a public employee has a protected interest in his job, we turn first to state law. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. In Illinois, most employees would face a presumption that their employment is at will. *Martin v. Federal Life Insurance Co.,* 109 Ill.App.3d 596, 602, 440 N.E.2d 998, 1003, 65 Ill.Dec. 143, 148 (1st Dist.1982). However, that presumption may not apply to employees of a police department. Most municipal police officers in Illinois have job security thanks to one or another Illinois statute. Whether one of these statutes applies, and which of them, "is determined both by whether the community in which he serves is over a specific population and whether it has elected to be controlled by the civil service provisions." *Palcek v. City of Chicago Heights,* 74 Ill.App.3d 702, 703, 393 N.E.2d 1218, 1220, 30 Ill.Dec. 871, 873 (1st Dist. 1979). The department could not discharge officers except for cause if Antioch is covered either by the Civil Service of Cities Act, Ill.Rev.Stat. ch. 24, ¶ 10–1–1 *et seq.,* or the Fire and Police Commissioners Act, Ill. Rev.Stat. ch. 24, ¶ 10–2.1–1 *et seq. See* ¶ 10–1–18; ¶ 10–2.1–17.

Neither side makes any argument on, or even any reference to, these statutes. The Civil Service Act is not mandatory. The Fire and Police Commissioners Act is only mandatory for municipalities with a population of over 5,000. ¶ 10–2.1–1; *Bovinette v. City of Mascoutah,* 55 Ill.2d 129, 131, 302 N.E.2d 313, 315 (1973). Antioch in 1980, as we have already noted, fell short of that figure by 581 persons. We therefore presume that that statute's mandatory provision does not apply here. However, either system could have been adopted voluntarily. Ill.Rev.Stat. ch. 24, ¶¶ 10–1–43, 10–2.1–27.

Plaintiffs do not allege such adoption, but they do allege that they received a hearing. Defendants do not deny the fact of that hearing, and even submit a transcript of it. One wonders why, if plaintiffs were employees at will, a hearing was held. If neither the Civil Service Act nor the Police Commissioners Act applies, removal of a village police officer would appear to be governed by ch. 24, ¶ 3–11–1, which does not require a hearing. Instead, the Village President simply removes the officer and reports the reasons to the Board, although the Board could countermand the removal with a two-thirds vote. Ordinarily it is charges against officers with job security which generate hearings. *See, e.g., Ratliff v. City of Milwaukee,* 795 F.2d 612, 624 (7th Cir.1986); *Olschock v. Village of Skokie,* 541 F.2d 1254 (7th Cir.1976); *D'Acquisto,* 640 F.Supp. at 612.

The Village could, of course, have given the Kuklas a hearing even though they were not entitled to one. However, there is an additional troublesome fact. In both the transcript of the hearing and an affidavit from Chief Miller which defendants submit, reference is made to probationary employees and a six-month probationary period for employees of the police department

(tr. at 26; Miller aff., ¶ 6). The existence of a class of probationary employees supports the inference of the existence of a class of non-probationary employees, *i.e.,* police officers with some job security.

If Antioch has both probationary and non-probationary police officers, and holds hearings before discharging the latter, its conduct could have created an expectation of job security in those officers which would be enforceable under Illinois law. *See Patkus v. Sangamon-Cass Consortium,* 769 F.2d 1251, 1263–1264 (7th Cir. 1985); *Vail,* 706 F.2d at 1438, 1440. Thus plaintiffs may have viable due process claims grounded on property interests, however inartfully pled. The existence of a property interest based on the parties' conduct is a fact question rarely resolved at the pleading stage. *Malcak v. Westchester Park District,* 754 F.2d 239, 241 (7th Cir.1985). Defendants have not met their burden under Fed.R.Civ.P. 56 of demonstrating the absence of a genuine dispute on this question. And if plaintiffs have property interests, the *ex parte* communications of which they complain could constitute a failure of the process due them.

 This court is aware that leaving the due process claims open while granting judgment on the association and privacy claims seems an anomalous result. Injury through an *ex parte* communication can be difficult to demonstrate and is in any case likely to permit only the recovery of nominal damages. *See D'Acquisto,* 640 F.Supp. at 621–622, 627. But, perhaps for that reason, the parties have thus far barely touched on the due process claims, either to develop the facts or to brief the issues. Therefore, summary judgment is premature. We decline to rule now, and ask instead for the parties to develop the record and brief the law on the question of whether or not employees of the Antioch Police Department have property interests. *Cf. United States Shoe Corp. v. Hackett,* 793 F.2d 161, 166 (7th Cir.1986). Summary judgment on plaintiffs' due process claim is withheld pending those submissions.

## C. Immunity

Since the due process claim is still open, so is the possibility of damages. This court therefore should consider the individual defendants' claims of immunity to determine if they nevertheless may be spared further litigation. *See Mitchell v. Forsyth,* 472 U.S. 511, 527, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).

The Board members assert absolute legislative immunity to plaintiffs' claims. It is true that legislators enjoy absolute immunity from damage awards under § 1983, and in this circuit that immunity extends to the boards of municipalities. *Reed v. Village of Shorewood,* 704 F.2d 943, 952–953 (7th Cir.1983). But it applies only when the liability would stem from a legislative act. *See Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 732–734, 100 S.Ct. 1967, 1974–1976, 64 L.Ed.2d 641 (1980); *Lake County Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 403–404, 99 S.Ct. 1171, 1178–1179, 59 L.Ed.2d 401 (1979). A legislator making an employment decision functions not as a legislator but essentially as any other employer would. He or she therefore has no absolute immunity from a damage award for an unconstitutional employment decision. *Davis v. Passman,* 442 U.S. 228, 246–247, 99 S.Ct. 2264, 2277–2278, 60 L.Ed.2d 846 (1979) (congressman not immune to claim that employee's discharge stemmed from sex discrimination); *Detz v. Hoover,* 539 F.Supp. 532, 534 (E.D.Pa.1982) (extending principle to municipal legislative body). *Cf. McMillan v. Svetanoff,* 793 F.2d 149 (7th Cir.1986) (absolute judicial immunity did not extend to court reporter's claim that judge terminated her because of her race).

 *Aitchison v. Raffiani,* 708 F.2d 96 (3d Cir.1983), on which the Board members rely, is not to the contrary. In that case, members of a town council were immune when the town's assistant building inspector lost his job as a result of a council decision. But the decision was to pass an ordinance eliminating the position of assistant building inspector. *See also Rateree v.*

*Rockett,* 630 F.Supp. 763, 770–771 (N.D.Ill. 1986) (budget cuts). The Board members do not contend that they were passing an ordinance when they discharged the Kuklas. Legislative immunity does not necessarily apply to their acts.

■ Of course, the surviving constitutional claim rests on a due process theory: that *ex parte* communications tainted the hearing. The Board members functioned as the decisionmakers at that hearing. It is possible that they may still assert absolute immunity, not as legislators, but as officials functioning in a judicial capacity. In *Supreme Court of Virginia,* 446 U.S. at 733–734, 100 S.Ct. at 1975–1976, the justices of the state supreme court had legislative immunity when acting in a legislative capacity. Logically, then, legislators acting in a judicial capacity would acquire judicial immunity. We cannot find such an immunity now, however. For one thing, the Board members have not asserted judicial immunity as a defense. For another, the justices in *Virginia* were exercising an authority which the state legislature had formally delegated to them. 446 U.S. at 721, 734, 100 S.Ct. at 1969, 1975–1976. Defendants have not referred us to a statute which gives the Board authority to hold employment hearings.

■ For the same reason we cannot now find immunity for defendant Clark, the Village Attorney. He asserts absolute prosecutorial immunity, which would apply to prosecutorial functions. *See Imbler v. Pachtman,* 424 U.S. 409, 427, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976). His acts related to the hearing at least sound prosecutorial, since he brought charges against the Kuklas. However, as with the Board, it is not clear that he had the authority to bring charges. Under ¶ 3–11–1, the nearest thing to filing charges is the report to the Board of reasons for firing, which function falls to the Village President. No matter what task Clark was carrying out, without authority he would be no prosecutor, and thus would have no prosecutorial immunity. If Clark and the Board wish to reassert an immunity defense, this court requests further briefing on the legal basis for the claimed immunity.

■ We can, however, find for Chief Miller. Plaintiffs' complaint alleges conduct by him only in relation to the association and privacy claim, not the hearing. Since only a due process claim remains, and on the complaint he has no personal involvement in it, he should be dismissed as a party. *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir.1982). We also note that apparently the only thing he did at the hearing was to appear as a witness. If so, he would have absolute immunity for those acts. *Briscoe v. La Hue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 1115–1116, 75 L.Ed.2d 96 (1983).

## V. Fair Labor Standards Act Claim

Plaintiff William Kukla brings a separate count against the Village under the FLSA for some 400 hours per year of overtime pay in each year dating back to 1980, when he became a sergeant. He seeks double the amount owed him under the penalty provisions of the Act. His claim of course has only been possible since 1985, when the Supreme Court held that the FLSA applied to municipalities. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). That decision overruled *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which had held the opposite.

■ The Village argues that *Garcia* should not apply retroactively. We agree with the Village, for the same reasons that Judge Leighton gives for so holding in *Brooks v. Village of Lincolnwood,* 620 F.Supp. 24 (N.D.Ill.1985). The standard for a decision which should apply only prospectively is set out in *Chevron Oil v. Huson,* 404 U.S. 97, 106–107, 92 S.Ct. 349, 355–356, 30 L.Ed.2d 296 (1971). The threshold question is whether the decision establishes a new principle of law. If it does, then we weigh how necessary retroactive application is to implementation of

the purpose and effect of the new decision against the likelihood of inequities if it is applied retroactively. *See also Johnson v. Arnos*, 624 F.Supp. 1067, 1074 (N.D.Ill. 1985).

*Garcia* passes the threshold since it overruled clear past precedent. *Brooks*, 620 F.Supp. at 26; *cf. Chevron Oil*, 404 U.S. at 106, 92 S.Ct. at 355. With Judge Leighton, we think that "wreak[ing] havoc on municipal budgeting," *Brooks*, 620 F.Supp. at 26, is not necessary to the purpose of *Garcia*. Retroactive application would inequitably impose a liability on municipalities which they were entitled to assume from *Usery* that they would never have. Therefore we decline to apply *Garcia* retroactively. Plaintiff does not allege that Antioch failed to respond promptly to *Garcia* for any paychecks issued after it was decided. Since his claim involves only the period before it, he has no FLSA claim.

## CONCLUSION

Defendants' motion for summary judgment on plaintiffs' count I is granted as to plaintiffs' freedom of association, privacy and equal protection claims. Decision as to plaintiffs' due process claim is withheld, and the court requests further submissions from the parties as indicated in this opinion. Charles H. Miller's motion to be dismissed as a party is granted; the motions of the other individual defendants to be dismissed on immunity grounds are denied. Defendants' motion to dismiss plaintiffs' count II is granted.