903 F.2d 510
 54 Empl. Prac. Dec. P 40,157, 5
Indiv.Empl.Rts.Cas. 918
Marvin RATHERT and Gary Zybak, Plaintiffs-Appellants,
v.
VILLAGE OF PEOTONE, Warren Baker, Ronald Cramer, John Hall,
James Janda, Thomas Tucker, Kenneth Eatinger,
Richard Anderson, and Gary N. Bogart,
Defendants-Appellees.
 No. 89-1435.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 29, 1989.
Decided June 1, 1990.
 
 John L. Gubbins, Gubbins & Associates, Chicago, Ill., for plaintiffs-appellants.
 P.L. Pawlowski, Kendall D. Griffith, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., William W. Kurnik, Kurnik, Cipolla, Stephenson & Barasha, Vincent C. Cipolla, Kurnick, Cipolla, Stephenson, Barasha & O'Dell, Arlington Heights, Ill., Lynn D. Dowd, Cassiday, Schade & Gloor, Chicago, Ill., for defendants-appellees.
 Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Male police officers wearing earrings?[1] Yes, and that gives rise to the constitutional issues in this case. Marvin Rathert and Gary Zybak, police officers of the Village of Peotone, Illinois, brought this civil rights action under 42 U.S.C. Sec. 1983 against the Village and various of its officials.[2] Count I of their complaint alleges that they were disciplined without regard to their rights to liberty and due process under the fourteenth amendment and Count II alleges that plaintiffs' free association rights had been violated in disregard of their first amendment rights.[3] In addition to the ear stud controversy, plaintiffs complain they were reprimanded by letters and disciplined for allegedly frequenting taverns while off duty and becoming intoxicated and for failing to complete certain police assignments. As a result of these activities, both plaintiffs suffered letters of reprimand being placed in their police personnel files and Rathert was demoted from sergeant to patrolman with diminished pay.
 
 
 2
 Upon cross-motions for summary judgment, the defendants' motion for summary judgment was allowed as to all defendants. As to Count I, the substantive due process count, the district court stated in its January 30, 1989, Memorandum Opinion and Order that the dispositive issue was whether the reprimand letters bore a rational relationship to a legitimate public interest. Plaintiffs argued that the allegations in the reprimand letters of public intoxication, failure to complete assigned duties and being disruptive were merely a pretext to discipline plaintiffs for their wearing ear studs. The district court held that the pretext issue was not material to the motion for summary judgment on the ground that even if defendants' sole reason for disciplining plaintiffs was that plaintiffs wore ear studs, the reprimand was rationally related to a legitimate public interest.
 
 
 3
 Count II of the complaint alleged that defendants violated plaintiffs' first amendment right of association. Plaintiffs contended that by wearing an ear stud they "were expressing their desire to associate with others who condone the wearing of an ear stud as part of their leisure dress" and that the defendants' discipline in some way "chilled" that desire. The district judge found no associational interest in those circumstances to warrant constitutional protection and granted summary judgment for all defendants also on Count II.[4]
 
 I. FACTUAL BACKGROUND
 
 4
 Plaintiffs, in a general and conclusory manner, branded allegations of public intoxication and dereliction of duty as merely pretextual reasons for their reprimands. Rathert claimed that he was never informed of reports that he was intoxicated while off duty or that he failed to complete assignments. Zybak claimed that Chief Bogart never wrote down the reports of his intoxication while off duty, his failure to appear on the range for firearms training, or his involvement in an automobile accident. Rathert was merely unable to recall being intoxicated and failing to complete assignments and Zybak did not deny the truth of the reports of his intoxication and problems in carrying out his duties. In allowing the defendants' motion for summary judgment, however, the district court did not resolve the pretext issues and we likewise find there is no need to pursue it. Plaintiffs do not argue that any failure of notice or hearing in connection with their reprimands raises a constitutional or factual issue. We therefore view this case as appropriate for summary judgment.
 
 
 5
 The general factual background is neither disputed nor complicated. Both plaintiffs reside in the Village of Peotone, Illinois, and are officers serving on the village police department. Peotone is a village in a rural area south of the Chicago metropolitan area and has a population of less than 5,000 with a correspondingly small police force. At the time the events giving rise to this action occurred, the force had only two supervisory officers, defendant Chief of Police Bogart, and Rathert, who was then a sergeant. Rathert has been on the village police force since 1980 except for a short period when he worked for the Will County Sheriff's Police. Zybak became a part-time village police officer in 1979 and a full-time patrol officer nad investigator in 1982. Chief Bogart conceded that both officers had performed their duties effectively up until late 1986 when the present troubles surfaced. Thereafter Chief Bogart claims the plaintiffs' performance as police officers deteriorated.
 
 
 6
 In December of 1986 things happened which have evoked the most attention. That month Rathert went to a jewelry store in Matteson, Illinois, The Jewel Box, had his left ear pierced, and purchased his gold ear stud. Prior to that time Rathert had not worn any type of earring. He explained that he started wearing the ear stud for personal reasons, because he "wanted it," and because he liked ear studs for fashion. As between his right or left ear there was no particular reason to have his left ear pierced except he wanted the ear stud there. Zybak, following Rathert's lead, went to the same jewelry store a short time later, had his left ear pierced, and bought himself an ear stud like Rathert's, but silver. Zybak explained that he wore his ear stud for "personal reasons," for personal jewelry adornment, and for fashion.
 
 
 7
 Both plaintiffs claimed there was no intent to wear their ear studs while on duty, but that it was necessary to do so for the first six weeks to prevent the newly pierced holes from closing. Each wore a Band-Aid over the ear stud while on duty so as to try to hide the ear stud. Zybak had some trouble with his Band-Aid ear stud concealment. On a cold day without his knowledge, the Band-Aid dropped off while he was on duty. Zybak explained this had happened even though he periodically checked to make sure the Band-Aid was still in place. While off duty, neither officer wore a Band-Aid and the ear studs were easily visible.
 
 
 8
 It did not take Chief Bogart and the other defendants long to react to these ear stud developments. Chief Bogart drafted a reprimand letter for each plaintiff that was approved in early January 1987 by the other defendants in their official capacities. Each plaintiff then received the reprimand letter, which asserted that the wearing of an ear stud violated the Peotone Police Policy Manual, that each plaintiff had been seen intoxicated in public, and that each had failed to complete certain police assignments, all in violation of their police regulations. A copy of each plaintiff's own reprimand letter was placed in his individual personnel file. In addition to his reprimand letter, Rathert was demoted from the police force's only sergeant, and the only supervisor in addition to Chief Bogart, to patrol officer. A resulting decrease in salary accompanied his demotion. Upon receiving these reprimands, plaintiffs immediately ceased to wear their ear studs on or off duty, or to frequent taverns or elsewhere where liquor was dispensed.
 
 
 9
 Although the reprimand letters went into their personnel files, not into the newspaper at least not through any action of the defendants, plaintiffs complained about the resulting effects of the reprimand letters. They claimed that they were held up to public ridicule, were ostracized from community activities and events, and were socially shunned by their peers, even family and friends, all of which disrupted their right to freely associate. Plaintiffs blamed these alleged consequences of the reprimands only upon the fact that they were disciplined, and not upon the fact that they were village policemen who wore ear studs in public and sometimes, it appears, may have conducted themselves in public in other ways unsuitable for police officers. Their complaints about the public reaction, however, illustrate in their own words some of the adverse impact their conduct had on the morale, discipline, and effectiveness of the Peotone Police Department, the underlying issue in this case.
 
 
 10
 At the time the police department had a policy manual that governed police conduct and service. Plaintiffs were required to be, and were, familiar with it. In general, each officer was to lead an exemplary private life. Officers were subject to duty call twenty-four hours a day, and were required to respond when called whether on duty or off, day or night. In addition, intoxication was prohibited while on or off duty. Any conduct unbecoming an officer, disobedience to orders, insubordination and other mentioned deficiencies were likewise prohibited. The manual also set forth certain standards for uniforms for male and female officers. One standard prohibited ornamental items. Female officers were permitted to wear facial makeup, but only in moderation. Hair ribbons and barrettes were not allowed. Some things, for instance, the ban on intoxication and the prohibition of beards, would obviously apply to male officers on duty or off. Nothing was said specifically in the manual about male officers wearing earrings or ear studs, probably because it was not anticipated that male officers would do so.
 
 
 11
 The depositions of Chief Bogart, all members of both the Police Committee and the Village Board of Trustees, reveal the unanimous view that the ear studs worn by the plaintiff officers, on duty or off, had a detrimental effect on police department morale and diminished the respect of Peotone residents for their police force. The chief believed that the wearing of the ear studs by an officer, on or off duty, detracted from police professionalism and violated the manual requirement to remain neat and groomed. The chief further explained that the citizens of Peotone knew and recognized who their police officers were whether the officers were in uniform or not. The chief had never heard of a police department that permitted its officers to wear any kind of earring, except for undercover work. Plaintiffs were not engaged in undercover police activity. A member of the Village Police Committee claimed that the officers had become the laughing stock of the community. Another committee member was of the opinion that the village citizens would not accept male officers wearing any type of earring, morale would suffer, and the department would function less effectively. Another member of the Village Board said that the comments of village citizens indicated astonishment at male officers wearing earrings, and that fact created public doubts about discipline within the village police force.
 
 
 12
 Others who testified by deposition offered similar views. A fellow police officer stated that he had been questioned, laughed at, and hurt by village citizens because his two plaintiff colleagues wore ear studs. Even in plaintiffs' families the ear stud caused some problems. Rathert's wife and sister explained that Peotone is a small town with a conservative viewpoint and that the majority disapproved of a male officer wearing an ear stud. Rathert's wife, obviously during a time of marital difficulties, also called Chief Bogart on a number of occasions to complain about her husband. She accused her husband of drinking and returning home and slapping her around. She also accused both plaintiffs of being "gay," an accusation that Chief Bogart said he did not believe. On another occasion Mrs. Rathert allegedly got Rathert's revolver and was going to shoot Zybak. Mrs. Rathert also expressed the view that Rathert deserved the punishment he received, and that the residents of Peotone and surrounding areas were "in an uproar." After plaintiffs had their ears pierced, some residents commented to her that Rathert's ear stud detracted from his authority as a police officer. Thus, the ear piercings themselves appears to have caused plaintiffs more immediate and personal problems than merely constitutional ones.
 
 II. ANALYSIS
 A. The Substantive Due Process Claim
 
 13
 The district court and the parties agree that the dispositive issue as to Count I is whether the reprimand letters issued by defendants to plaintiffs affected a constitutionally protected liberty interest, and whether the police policy expressed in those letters bears a rational relationship to a legitimate public interest. In other words, we must determine whether plaintiffs asserted a cognizable substantive due process claim under 42 U.S.C. Sec. 1983.
 
 
 14
 The reprimand letters were based on three grounds: public intoxication, failing to complete police assignments, and wearing an ear stud on duty and off duty in violation of the Peotone Police Manual. The arguments here focus not on any claimed right to wear ear studs while on duty and in uniform, but when off duty and not in uniform. Their ear studs, plaintiffs claim, expressed their constitutional liberty interest in "individualized dress." Plaintiffs do not claim that they cannot be prohibited from wearing ear studs on duty even though ear studs or earrings are not specifically mentioned in the manual.
 
 
 15
 The district court observed that although the Supreme Court has not conclusively determined whether the fourteenth amendment creates a liberty interest in matters of personal appearance, this circuit has held that "choice of appearance is an element of liberty." Pence v. Rosenquist, 573 F.2d 395, 399 (7th Cir.1978); see also Crews v. Cloncs, 432 F.2d 1259 (7th Cir.1970); Breen v. Kahl, 419 F.2d 1034 (7th Cir.), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1969). Therefore, we begin as did the district court, by determining whether the reprimand letters bear a rational relationship to a legitimate public interest. The district court found such a relationship to exist and so do we.
 
 
 16
 The district court, as well as both parties, relied on Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). In Kelley, the president of the Patrolmen's Benevolent Association challenged the constitutionality of a county regulation limiting the length of hair worn by male county police officers. The Court found no substantive due process fault with the regulation. In reaching that conclusion, the Court considered it "highly significant" that the protection of the fourteenth amendment was being sought, not by a member of the citizenry at large, but by and for police officers. The Court had previously recognized that although state employment cannot be conditioned on surrender of first amendment rights, the state, nevertheless, has interests in regulating the speech of its employees. Those interests differ significantly from those the state possesses in connection with the regulation of the speech of the citizens in general. See Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968); CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).
 
 
 17
 The Court found that there was a significant distinction between the police and the public at large because of the police duty to keep the peace and the myriad other responsibilities of the police that have no counterpart in the public at large. In considering those other demands on police, the Court noted that police must wear standard uniforms specific in each detail, must salute the flag when in uniform, and may not take an active role in local political affairs. All of those common police requirements infringe on a police officer's freedom of choice in personal matters, and the political activity ban applies even when the police officers are off duty. Although the court of appeals had found that there was no justification to characterize the police as "para-military" and thus deserving of "unique judicial deference," the Supreme Court held that the county's choice of an organizational structure for its police force was nevertheless entitled to deference. A police structure had been chosen by the county that the county obviously believed would better enable the police to fulfill their responsibilities. That county organizational choice necessarily emphasized the overall need for discipline, esprit de corps and uniformity.
 
 
 18
 The Court in Kelley then viewed the challenged hair length regulation in the context of the county's police structure. The Court observed that the states' police power to guard the safety of persons and property by employing a uniformed police force to aid in those responsibilities requires that the choice of organization, dress, and equipment be a state decision entitled to a presumption of legislative validity. The Court also noted that in other contexts there is wide latitude accorded the government in the "dispatch of its internal affairs." Id. 425 U.S. at 247, 96 S.Ct. at 1446. The ultimate question, in the Court's view, was not "whether the State can 'establish' a 'genuine public need' for the specific regulation ... [but] rather whether [the police officers] can demonstrate that there is no rational connection between the regulation ... and [police responsibilities]." Id. The Court held that the hair length regulation clearly survived the plaintiff's constitutional challenge. The Court recognized that the overwhelming majority of state and local police are uniformed because similarity in appearance of police officers is desirable. This similarity may be desirable because it allows members of the public to readily recognize police officers or because it aids police esprit de corps. The Court held that either reason provided a sufficiently rational justification for the regulation to defeat the constitutional challenge.
 
 
 19
 The Supreme Court's holding in Kelley clearly supports the district court's decision in this ear stud case. The hair length regulation in Kelley applied to officers "while on duty" and the officers in the present case seek only to wear their ear studs while off duty. That difference, however, is only superficial. The hair length restriction in Kelley, by its very nature, applied whether the police officers were on or off duty. The Court upheld the regulation even though it governed the police officer's personal appearance when he was not performing his police duties and was not in uniform. So it is in the present case.
 
 
 20
 Few would quarrel with the Peotone police regulations that specifically prohibit, without reference to whether on duty or off, an officer being publicly intoxicated, or from using narcotics without a doctor's prescription. Peotone also prohibits beards and requires mustaches to be neatly trimmed. Those restrictions also reach an officer's personal conduct when not on duty. The record demonstrates that the wearing of ear studs by Peotone police officers was seen by those who run the police structure, as well by as the public generally, to have an adverse impact on police effectiveness.
 
 
 21
 The Peotone police officers are members of a small community. They are generally known and recognized. There is little difference in the way the Village's police officers are publicly viewed, whether their objectionable conduct as police officers occurs on duty or off, or whether they wear the ear stud on duty or off. Plaintiffs admit being subject to ridicule, but ascribe it to their being disciplined, not to the wearing of ear studs. Such a claim, however, totally misplaces the blame for their discomfort. The record shows that even some family members and officer colleagues were disturbed by the ear studs as much as were the city officials. That earrings or ear studs were not specifically prohibited in the regulations is of no consequence, as the regulations are sufficient to reasonably ascribe the outlines of what is prohibited and what is expected of police officers whether on duty or off. No one could reasonably read the regulations as containing some implied exception at odds with the general tenor of the rest of the regulations that would permit certain off duty conduct that nevertheless would have an adverse impact on the police force.
 
 
 22
 It is obvious from the record that plaintiffs not only caused an adverse impact on police discipline, esprit de corps and uniformity, factors found by the Supreme Court in Kelley to be of controlling consequence, but caused great public dissatisfaction as well. Plaintiffs totally fail to meet the burden imposed by Kelley of showing no rational connection between the male ear stud prohibition and their police responsibilities.
 
 
 23
 Plaintiffs, relying on Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), argue that the opinion of the district court "sends the message that state employees have no liberty rights as citizens to freedom of choice or individuality. For if the employees exercise those rights in a manner inconsistent with the norm of society that individuality will serve to justify prohibition or punishment." Roberts concerned the admission of women to membership into the Jaycees, a nonprofit national membership corporation. In the present case the plaintiffs misread the message that is directed only to the distinct circumstances of the police officers of Peotone.
 
 
 24
 Plaintiffs also claim that the district court's holding can only be based upon the erroneous concept that a police force is a para-military organization with the military's need for discipline and uniformity, a view that at least one district court in this circuit has rejected. Kukla v. Village of Antioch, 647 F.Supp. 799 (N.D.Ill.1986). Kukla involved a police sergeant and a female police dispatcher unmarried but living together. The district court avoided Kelley by pointing out that the conduct complained about in Kukla fell within the "personal intimacies of the home," and that type of personal choice carried more weight in a constitutional balance than selection of hair length. However, in the instant case we are concerned with police appearance and behavior in public, not just with the personal intimacies of the home. Our holding is limited to the particular facts in this case. Plaintiffs have not argued they have a right to wear ear studs while vacationing outside the general Peotone area and not subject to call, and we do not decide that question.
 
 
 25
 Plaintiffs also argue that the only interest in prohibiting the wearing of ear studs while off duty is to promote Peotone's conservative viewpoint and narrow-mindedness and to suppress individuality, but that such an interest is not legitimate. That is an astounding argument. Plaintiffs were not hired as police officers to change "conservative or narrow-minded" Peotone, as Peotone is characterized by them. The important responsibilities of these police officers do not include attempting to change the Village's political and social outlook, whatever it may be, by wearing ear studs.
 
 B. The First Amendment Claim
 
 26
 The complaint's Count II alleges first amendment violations in the briefest and most conclusory way by claiming only that the disciplining of plaintiffs violated their constitutional rights to free association. In the district court plaintiffs elaborated on the complaint by claiming that by wearing ear studs they "were expressing their desire to associate with others who condone the wearing of an ear stud as part of their leisure dress." Plaintiffs claimed that the defendants' disciplinary actions in some way "chilled" that desire.
 
 
 27
 Plaintiffs rely upon Wilson v. Taylor, 733 F.2d 1539 (11th Cir.1984), to demonstrate that a violation of a police officer's freedom of association occurs when disciplined for off duty activities. A police officer in that case was fired for dating the adopted daughter of a convicted felon reputed to be a mob leader. That court held that "dating is a type of association that must be protected by the first amendment's freedom of association." Id. at 1544. In any event, however a comparable case on those facts might fare in this circuit, there is in the present case no dating or other intimate personal relationship.
 
 
 28
 We are no more impressed with plaintiffs' first amendment argument than was the district court. Plaintiffs are not prohibited from associating with others who wear ear studs, even other male police officers if they can find any. Plaintiffs have identified no police force anywhere where police officers wear ear studs on or off duty, nor identified any other particular group that does. As the district court noted, the Supreme Court has recognized a right to associate for the purpose of engaging in activities protected by the first amendment. Roberts, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In determining whether a particular association is sufficiently personal or private to warrant constitutional protection, courts consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship. Board of Directors of Rotary International v. Rotary Club, 481 U.S. 537, 546, 107 S.Ct. 1940, 1946, 95 L.Ed.2d 474 (1987). Plaintiffs, however, have totally failed to identify any associational interest as police officers that warrants constitutional protection, nor could the district court find any suggestion by plaintiffs that they wear ear studs to express political, social, economic, educational, religious or cultural viewpoint, or any other expressive activity. Plaintiffs' justification for wearing the ear studs is merely that they "want to" and "for fashion." Those reasons would be enough for members of the public to wear ear studs, but not for police officers who work for the public.[5]
 
 III. CONCLUSION
 
 29
 For the foregoing reasons, the district court's decision is, in all respects, affirmed.
 
 
 30
 FAIRCHILD, Senior Circuit Judge, concurring.
 
 
 31
 I do not take issue with the propriety of a police department regulation prescribing a uniform to be worn on duty and prohibiting the use of personal ornaments while on duty. If the judgment of the district court went no further than upholding the prohibition against wearing ear studs while on duty, I would readily join in affirming it. The problem which gives me pause is that the judgment now being affirmed upholds a prohibition against the wearing of ear studs by male police officers while off duty, at least in the particular town where this case arose.
 
 
 32
 I think we all agree that in order to sustain a regulation of off duty conduct, the regulation must be rationally related to a legitimate public interest such as the effectiveness of the officers. Here it appears that the rational relationship rests upon the alleged proposition that a significant segment of the town's population attribute to a male who wears an ear stud some personal characteristic such that they will ridicule rather than respect him. The theory appears to be that at least in a small community this response by citizens will impair the officer's effectiveness on duty even though it is only off duty that he is seen wearing the stud.
 
 
 33
 It would be hard to argue with the proposition that if particular conduct of a police officer while off duty tends to show a trait which will adversely affect his performance on the job, or to cause a loss of respect for him on as well as off the job, the prohibition or discipline of such conduct is rationally related to a legitimate public interest. Intoxication in public would be an example of a case where a judge can decide a priori that a rational relationship exists.[1] In Swank v. Smart, 898 F.2d 1247 (7th Cir.1990), a married police officer had been disciplined, in part, for his off duty conduct in taking a young woman he met on the street for a late night motorcycle ride. This court decided, a priori, that disciplining him was not unreasonable. 898 F.2d at 1252-53. I do not believe, however, that judges can say a priori that a male's wearing an ear stud tends to cause disrespect for him as a policeman.
 
 
 34
 The question we now reach is whether the court must find that the community attitude adverse to ear studs exists in fact before such attitude can be a link in a rational relationship between prohibiting off duty ear studs and the public interest. Or, is it enough to find that in taking action, the Chief and other decision makers reasonably perceived that this community attitude existed?
 
 
 35
 If a factual determination be required, the fact has not yet been determined. There has been no trial, and although many assertions concerning community attitude were before the court on summary judgment, they were not undisputed. One witness testified that she heard no reaction to Rathert's ear stud before this lawsuit began, and that after it was publicized, many persons commented that the Chief had no reason to demote Rathert.
 
 
 36
 I conclude, however, that the rational relationship test requires no more than that the decision makers reach their conclusion rationally, and that their reasonable perception of the community attitude is enough. I reach this conclusion reluctantly because of the likelihood that this is just an instance of bias against those who do not conform.
 
 
 
 [1]
 What plaintiffs wore was either a gold or silver ear stud about an eighth of an inch in diameter. Since an earring is defined in both the Oxford and Webster Dictionaries as an ornament worn on the earlobe, it appears that an ear stud is a minimum size earring. We will, however, hereafter refer to the particular earrings as ear studs as did the district judge
 
 
 [2]
 Defendants, in addition to the Village, include the Village Chief of Police, George Bogart; members of the Police Committee of the Board of Trustees of the Village, Ronald Cramer, John Hall and James Janda; and members of the Village Board of Trustees, Thomas Tucker, Kenneth Eatinger, and Richard Anderson
 
 
 [3]
 The district court had previously dismissed much of Count I of this two-count complaint that alleged deprivation of property rights. That dismissal has not been appealed
 
 
 [4]
 The district court, by disposing of the complaint on its merits by summary judgment, did not reach the issue of the qualified immunity of the defendants
 
 
 [5]
 The police officer in Etscheid v. Police Bd. of Chicago, 47 Ill.App.2d 124, 197 N.E.2d 484 (1964), had a unique problem. In upholding his discharge the court, citing a book entitled Police Administration by O.W. Wilson, a former Superintendent of Chicago Police, makes the point that for the courts to become the final arbitrators in police disciplinary matters will cause a breakdown of police discipline and morale and frustrate police administration
 
 
 [1]
 As explained by Judge Wood, intoxication while in public was another ground for discipline in this case. Because there was some dispute about the facts, the adequacy of this ground is not before us