Cheryl HARRISON, as Administrator of the Estate of Jennifer Harrison, Deceased, Cheryl Harrison, as Guardian for Ryan Harrison, a minor, and Cheryl Harrison, Individually, Plaintiff,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, a Delaware corporation, Defendant.

No. 88 C 2193.

United States District Court, N.D. Illinois, E.D.

Aug. 21, 1990.

Gene L. Armstrong, Cichocki & Armstrong, Ltd., Oak Park, Ill., for plaintiff.

Kenneth J. Wysoglad, John F. Newell, Michael L. Sazdanoff, Robert J. Prendergast, Kenneth J. Wysoglad & Associates, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

On June 14, 1987, according to plaintiff Cheryl Harrison ("Harrison"), the automobile in which her daughter, Jennifer Harrison ("Jennifer"), was riding as a passenger was struck by a train operated by defendant Burlington Northern Railroad Company ("Burlington"). Both Jennifer and the driver of the automobile, Jacqueline Hughes ("Jackie"), died from injuries sustained in the collision. Harrison, as the administrator of Jennifer's estate and the representative of Jennifer's heirs, filed a three-count complaint in federal court, seeking, in count I, damages suffered by Jennifer's heirs as a result of her allegedly wrongful death; in count II, compensation for personal injuries suffered by Jennifer and for property damage expenses incurred by her estate; and in count III, punitive damages based on Burlington's allegedly willful and wanton misconduct. In an earlier opinion, this court granted Burlington's motion to dismiss count III, holding that punitive damages are not recoverable under either the Illinois Wrongful Death Act

or the Illinois Survival Act. *Harrison v. Burlington Northern Railroad*, No. 88 C 2193 1989 WL 13206 (N.D.Ill. February 10, 1989). Now before this court is Burlington's motion for partial summary judgment with respect to count II of Harrison's complaint. For the reasons set forth below, that motion is granted.

### FACTS

On July 14, 1987, a vehicle driven by Jackie Hughes was struck by a train as it was crossing the Harmony Road railroad crossing in Ogle County, Illinois. The westbound train hit the automobile, which was travelling north on Harmony Road, on the passenger side. The force of the accident catapulted the car from Harmony Road in a northwest direction; it ultimately landed approximately 22 feet north of the railroad tracks and 65 feet west of Harmony Road. As a result of the impact, Jackie and a passenger, Jennifer Harrison, who was sitting in the right front seat, were both thrown from the car. Jennifer was found west of the car and approximately 29 feet north of the railroad tracks. Jackie was also found west of the car but farther north, closer to a fence separating an adjoining campground and approximately 60 feet north of the railroad tracks [1] (plaintiff's exhibit 10 (diagram of accident scene)).

Among the first witnesses to arrive on the scene were Cathleen Gyrion ("Gyrion"), Timothy Arlowe ("Arlowe"), and Kimberly Baker ("Baker"), who each saw only one of the two victims; the parties contest, however, which victim these witnesses encountered. Shortly after the accident, Brian Mueller ("Mueller"), a paramedic, arrived on the scene and rendered aid to Jennifer. He was joined by Michael Miller ("Miller") and Dan Fichtner ("Fichtner"), who arrived

---

1. Although Harrison does not identify in her 12(m) statement which victim was found closer to the railroad tracks and which was found closer to the fence, she does assert these facts in her brief in opposition to Burlington's motion for partial summary judgment, and therefore we do not view this representation of the victims' positions to be in dispute. Moreover, the overwhelming weight of the evidence in the record supports this characterization.

Some of the facts narrated *infra* are also conceded in Harrison's brief but not in her 12(m) statement, and we treat them similarly.

at the scene in an ambulance.[2] Jennifer was then transported to KSB Hospital in Mt. Morris ambulance 1 F 35. Jackie was treated initially by Virginia Sheets ("Sheets"), a nurse who arrived on the scene just after Mueller. Before being transported to the hospital in a Polo ambulance, Jackie was treated by several other paramedics who arrived shortly after Sheets.

## DISCUSSION

Count II of Harrison's complaint asserts that Jennifer sustained serious injuries as a result of Burlington's negligence, causing profound pain and suffering, and that Jennifer's estate incurred significant expenses, including medical, funeral, estate administration, and legal fees. These damages, count II continues, are compensable under the Illinois Survival Act, Ill.Rev.Stat. ch. 110½, § 27–6 (1989). Burlington argues in its motion for summary judgment that Harrison cannot affirmatively prove any of the asserted damages and, accordingly, no rational trier of fact could find for Harrison on this count.

### 1. *Damages for Pain and Suffering*

■ Since 1974, Illinois has recognized an action for conscious pain and suffering, in addition to one for wrongful death, where an injured party dies as a result of his injuries. *Murphy v. Martin Oil Co.*, 56 Ill.2d 423, 308 N.E.2d 583 (1974); *In re Air Crash Disaster Near Chicago, Illinois, MDL 391*, 507 F.Supp. 21, 23 (N.D.Ill.1980). To recover damages, however, a plaintiff must prove that the decedent actually and consciously suffered pain before death; where the death is instantaneous or where the decedent is rendered immediately unconscious, an action for pain and suffering cannot be sustained. *See In re Air Disaster*, 507 F.Supp. at 24; *Maras v. Bertholdt*, 126 Ill.App.3d 876, 890, 81 Ill.Dec. 728, 738, 467 N.E.2d 599, 609 (2d Dist.1984). Moreover, during the alleged period of con-

sciousness after the injury, "the evidence ... must make more than speculative the conclusion that decedent was conscious and suffered pain." *Maras*, 126 Ill.App.3d at 890–91, 81 Ill.Dec. at 738–739, 467 N.E.2d at 609–610; *Bart v. Union Oil Co. of California*, 185 Ill.App.3d 64, 68, 132 Ill.Dec. 848, 851, 540 N.E.2d 770, 773 (3d Dist.), *appeal denied*, 128 Ill.2d 661, 139 Ill.Dec. 510, 548 N.E.2d 1066 (1989); *In re Air Crash*, 507 F.Supp. at 24.

■ Burlington does not offer direct proof that Jennifer died or lost consciousness immediately. It does establish, however, that by the time the first paramedic, Brian Mueller, appeared on the scene, Jennifer was unconscious (*see* Mueller dep. at 29), and she never regained consciousness (*see id.;* Fichtner dep. at 24–25; Miller dep. at 30; Deets dep. at 10, 13; Tannenbaum dep. at 12). Mueller, who was off duty at the time of the accident and swimming at a nearby campground, went to the scene of the accident in response to a call for medical personnel over the campground's public-address system; he estimates that he first saw Jennifer five to seven minutes after hearing the announcement (Mueller dep. at 15). It is unclear how much time lapsed between the accident and the public-address announcement, but in any event, any possible period of consciousness during which Jennifer might have suffered pain from her injuries ended five to seven minutes after this announcement was broadcast.

This mere possibility is not alone enough to defeat Burlington's motion, for it can only support a speculative conclusion of conscious pain and suffering. The record reveals additionally, however, that several witnesses claim to have heard an injured woman say "my baby" or "where is my baby" while trying to sit up (*see* Gyrion dep. at 22; Arlowe dep. at 84, 86, 89–90; Baker dep. at 64; Sheets dep. at 15). This evidence certainly suggests that at least

---

**2.** Harrison argues in her response to Burlington's 12(*l*) statement that none of the witnesses can identify which victim they saw or treated because the identification is based on hearsay evidence. But Harrison concedes in

her brief that Mueller and Miller rendered aid to Jennifer, and she admits Burlington's assertion in its 12(*l*) statement that Fichtner worked on the same victim as Miller and Mueller.

one of the two victims was conscious following the accident, but again, without more, the conclusion that it was Jennifer, and not Jackie, that spoke those words is too speculative to sustain a pain and suffering count. *See Stanford v. McLean Trucking Co.*, 506 F.Supp. 1252 (E.D.Tex. 1981) (evidence too speculative where a bystander heard a scream emanating from inside a car containing three passengers but it was impossible to identify the actual screamer).[3]

But there is more. At the time of the accident, Jackie was seven months pregnant and had a one-year-old son. By contrast, Jennifer was not pregnant, had no children, and had never been married (defendant's 12(*l*) statement ¶¶ 15, 16). Although this court does not believe that a non-pregnant, single woman with no children could *never* utter "my baby," we consider the evidence of Jackie's pregnancy and motherhood to render most plausible the conclusion that it was Jackie who was heard to speak and highly speculative the conclusion that it was Jennifer. Witnesses who heard this utterance, moreover, clearly understood it as a reference to an actual infant rather than as a neutral exclamation or expletive blurted under the stress and excitement of the situation. Witness Cathleen Gyrion's reaction upon hearing the injured woman say "my baby" was to panic "because it was a bad accident and I didn't want to see a baby" (Gyrion dep. at 22). The victim's words prompted witness Timothy Arlowe to go to the car to look for a baby who he thought might be there (Arlowe dep. at 93). Similarly, witness Kimberly Baker indicated that bystanders at the scene were concerned about the possibility that a baby was involved in the accident because "she [the victim] had mentioned a baby" (Baker dep. at 66).

That it was Jackie and not Jennifer who spoke after the accident is bolstered further by the testimony of those who heard her speak. Most directly attributing the words to Jackie is the testimony of Virginia Sheets, who heard the victim she was treating say, in a very quiet voice, "[w]here is my baby?" (Sheets dep. at 15). Harrison concedes in her brief that Sheets treated Jackie (plaintiff's brief in opposition at 10), and this conclusion is fully supported by evidence in the record.

Despite Harrison's rather categorical assertion that "[t]he uncontested facts establish (by almost irrefutable circumstantial evidence) that Jennifer Harrison is the victim these witnesses [Gyrion, Arlowe, and Baker] saw" (plaintiff's brief in opposition at 13), we find that the testimony of these witnesses, too, identifies Jackie as the speaker. Two of the witnesses place the victim closer to the fence and farther from the railroad tracks: Gyrion testified that the injured woman was west of the car and about 100 feet from the track (Gyrion dep. at 29–30), and Arlowe remembered the woman's position to be closer to the fence than to the railroad tracks—approximately 9 to 12 yards from the fence (Arlowe dep. at 83–84). Baker did not describe the woman's position in relation to the tracks or the fence but testified that the victim lay northeast of her as she went through the fence and west of the automobile. Harrison's representation that all three of these witnesses testified that the woman they found was closer to the tracks, then, is entirely unfounded.

In fashioning her argument, moreover, Harrison ignores Baker's statement regarding the clothing worn by the woman she saw. Unprompted by her deposer, Baker testified that the victim was wearing a pinkish sleeveless or short-sleeved shirt and beige shorts (Baker dep. at 63). By contrast, Jennifer was described as wearing a deep bluish outfit (*see* Miller dep. at 19; Harrison dep.).

Finally, Harrison argues that Arlowe, Gyrion and Baker's testimony regarding

---

**3.** The court in *Stanford* applied Texas law in reaching its conclusion, but it based its decision on this issue on a principle that is shared by Illinois jurisprudence—that an award for conscious pain and suffering is improper if the evidence of conscious pain is too speculative.

And although the conclusion was reached after a bench trial rather than on a motion for summary judgment, the court found the evidence to be insufficient on this issue, suggesting a ruling as a matter of law.

the severity of the facial injuries sustained by the individual they saw establishes that they encountered Jennifer rather than Jackie. There is no indication, however, that Jennifer's facial injuries were "more obvious and severe" than Jackie's. True, Michael Miller testified that the victim he treated, Jennifer, had a cut on her forehead (Miller dep. at 18), and the existence and location of this wound is corroborated by the deposition of one of the doctors who attempted to revive Jennifer at the hospital (Deets dep. at 20). But the deposition evidence does not establish that Jackie suffered no or less severe facial lacerations, and the xeroxed copies of post-mortem photographs that Harrison offers in support of this proposition are too distant in time and too poor in quality to indicate, even relatively, how the two victims' facial injuries compared moments after the accident. The facial injuries that Gyrion, Arlowe and Baker describe also differ materially from the lacerations reportedly sustained by Jennifer. Arlowe's testimony suggests that the victim's nose was particularly injured: "She was bleeding on her face real bad.... On her whole face, running down her face.... By her nose.... With the blood all around her nose, I can't really tell you [the deposer] if it was off her face or hanging on her face" (Arlowe dep. at 91). Baker similarly recounted that the woman's "face appeared to be bloody" and that the blood on her face was "[i]n the nose area" as though there was a bloody nose (Baker dep. at 65–66). Somewhat less specifically, Gyrion testified that the woman had "blood coming from her mouth and on her face and she was cut ... [a]cross her nose, on her head I don't know where else" (Gyrion dep. at 33). Testimony regarding Jennifer's injury, by contrast, focused on a cut on her forehead (Miller dep. at 18–19; Deets dep. at 20); indeed, Miller stated that the forehead laceration was "the only major thing that I saw" (Miller dep. at 18–19). Descriptions of the facial injuries observed by Gyrion, Arlowe and Baker, then, serve only to create further doubt that the victim they saw was Jennifer.

It is clear that one of the victims spoke and moved after the accident. A review of all of the evidence presented, however, leads this court to conclude that this activity can only reasonably be attributed to Jackie. Although we are required on this motion for summary judgment to view all the evidence in the light most favorable to the non-movant, here the plaintiff, *see Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir.1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987), we need not draw all conceivable inferences in favor of the plaintiff but only reasonable ones. *See Kukla v. Village of Antioch*, 647 F.Supp. 799, 813 (N.D. Ill.1986). The evidence on this issue so decisively stacks up against Harrison that no reasonable factfinder could conclude that Jennifer experienced conscious pain and suffering, and accordingly, summary judgment in favor of Burlington is appropriate. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### 2. Damages for Injury to Property

■ In addition to damages for Jennifer's conscious pain and suffering, count II of Harrison's complaint seeks compensation under the Illinois Survival Act for medical expenses, funeral expenses, estate administration expenses, and legal expenses incurred by Jennifer's estate. Jennifer's hospital and doctor bills, however, were paid directly by the insurer of the automobile involved in the accident (defendant's 12(*l*) statement ¶ 36). Jennifer's estate, therefore, has incurred "no expense, obligation, or liability" in connection with her medical bills, and allowing additional damages would serve not to compensate Jennifer's estate for expenses incurred but to punish Burlington for its alleged negligence. *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill.2d 353, 362–63, 29 Ill.Dec. 444, 448, 392 N.E.2d 1, 5 (1979).[4]

---

**4.** Proceeds paid to Jennifer's estate by the insurance company, therefore, fall outside the collateral source rule because the policy was procured and the premiums were paid not by Jennifer or her estate but by the owner of the automobile, Thomas Denham (Jackie's father).

■ Whether Harrison's claim for funeral and cemetery expenses, reported by Harrison as $4,498.75 and $492.81, respectively (defendant's exhibit O at 7), can survive Burlington's motion for partial summary judgment is a trickier issue. It is clear that an action can be brought against a tortfeasor by the administrator of a decedent's estate for funeral bills incurred as a result of the defendant's tortious conduct. Indeed, this cause of action, first recognized in Illinois in the 1960 case *Saunders v. Schultz*, 20 Ill.2d 301, 170 N.E.2d 163 (1960), represented the first departure from the long-standing principle, set forth in *Holton v. Daly*, 106 Ill. 131 (1882), that where death resulted from a defendant's tortious act, the exclusive remedy was under the Wrongful Death Act. In *Saunders*, the Illinois Supreme Court permitted a widow to maintain an independent action for the medical and funeral expenses incurred as a result of the wrongful death of her husband, finding there to be "no legally cogent reason for denying a spouse the right to recover" these expenses and noting additionally that a surviving spouse is liable for these expenses under the family expense statute. 20 Ill.2d at 309–10, 170 N.E.2d at 168. This last observation, however, has been interpreted not as the decisive basis underlying the *Saunders* ruling but rather as an ancillary rationale supporting it, and thus even expenses not covered by the family expense statute have been held recoverable under the *Saunders* decision. *See, e.g., Gates v. Chicago & Eastern Illinois Railroad Co.*, 227 F.Supp. 652, 653 (N.D.Ill.1964). And although the plaintiff in *Saunders* was the spouse of the decedent, the court recognized in *dicta* that the administrator of a decedent's estate could also bring a cause of action to recover funeral expenses:

> [W]e believe that the common law should be construed to permit the recovery of such funeral and medical expenses in an action either by the decedent's estate, or, as in the instant case where no claim was made, by the surviving spouse.

*Saunders*, 20 Ill.2d at 310, 170 N.E.2d at 168; *see also Ballweg v. City of Springfield*, 130 Ill.App.3d 241, 246, 84 Ill.Dec. 941, 944, 473 N.E.2d 342, 345 (4th Dist. 1984), *aff'd in part and rev'd in part on other grounds*, 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373 (1986); *National Bank of Bloomington v. Norfolk & Western Railway Co.*, 46 Ill.App.3d 757, 763, 5 Ill.Dec. 898, 902, 362 N.E.2d 369, 373 (4th Dist.1977), *aff'd*, 73 Ill.2d 160, 23 Ill.Dec. 48, 383 N.E.2d 919 (1978).

■ The *Saunders* decision created a common law cause of action, however, and it is not clear to this court whether a claim for funeral expenses may be properly brought under the Survival Act. At least one court has viewed this action as distinct from a Survival Act claim. *See Ballweg*, 130 Ill.App.3d at 245–46, 84 Ill.Dec. at 944, 473 N.E.2d at 345. On the other hand, the *Saunders* holding encompassed all "pecuniary losses suffered by either [the estate or the spouse] or both which are not recoverable under the Wrongful Death Act," 20 Ill.2d at 311, 170 N.E.2d at 169, including medical expenses, and a claim for medical expenses does fall within the purview of the Survival Act. *See In re Aircrash*, 507 F.Supp. at 23. On a conceptual level, however, it is difficult to imagine a claim for funeral expenses as an action that accrued to the decedent before his death and that remains viable after his death only by vir-

Although there is some indication in the case law that the collateral source rule is not applicable only where the insurance premiums were paid by the tortfeasor himself, *see, e.g., Levy v. Narrod Moving Services, Inc.*, 120 Ill.App.3d 528, 531, 76 Ill.Dec. 50, 53, 458 N.E.2d 189, 192 (2d Dist.1983), we think that the Illinois Supreme Court in *Peterson* contemplated a much broader exception to the rule, intending to foreclose recovery from the tortfeasor where the insurance policy was procured by *anyone* other than the actual injured party.

In this case, moreover, because the benefits were received pursuant to an insurance policy procured by the owner of the automobile involved in the accident, the collateral source rule seems especially inapplicable. These benefits were paid out on behalf of the driver of the car, herself a potential tortfeasor, and certainly a plaintiff is not permitted to recover the same damages for an injury from two tortfeasors. *See Haupt v. Golick*, 57 Ill.App.2d 481, 484–85, 206 N.E.2d 542, 544 (3d Dist.1965).

tue of a survival statute. And although Harrison lists funeral expenses as an element of the damages that she is seeking in count II, which is brought under the Survival Act, she does not, in her subsequent filings, challenge Burlington's assertion that these expenses are not recoverable under the Survival Act. Accordingly, while we grant Burlington's motion with respect to this claim, we afford Harrison the opportunity to amend her complaint to replead her claim for funeral expenses as a separate cause of action.[5]

### CONCLUSION

For the foregoing reasons, we grant Burlington's motion for partial summary judgment, and count II is stricken from the complaint. Leave is granted to Harrison, however, to amend the complaint with respect to her claim for post-death pecuniary losses.

**5.** Harrison has not pursued her claim for estate administration expenses, neglecting to list it as part of the "losses or expenses ... claim[ed] as damages in this lawsuit" in response to Burlington's interrogatory 11(a) and failing to raise it in response to Burlington's current motion for summary judgment. Accordingly, Harrison has not persuaded us that this expense is recoverable under the Survival Act. As an expense incurred after death, costs associated with the administration of Jennifer's estate possibly may be proper in a *Saunders* common law action, however.

Harrison additionally lists attorneys fees as a component of the damages that she is seeking under the Survival Act, but she fails to include this expense in her answer to Burlington's interrogatory. In any event, these fees are not recoverable absent specific statutory or contractual authority.